## STATE *v.* W. H. STIMPSON.

## STATE *v.* EDWARD LEE.

### May Term, 1905.

Present: ROWELL, C. J., MUNSON, START, WATSON, HASELTON, and POWERS, JJ.

### Opinion filed October 25, 1905.

*Constitutional Law — Contemporaneous Construction—"The Law of the Land"—"Due Process of Law"—Prosecution of Felonies by Information—V. S. 1867 — Validity— Statutory Rape—Cross-Examination of Prosecutrix— Specific Instances of Sexual Intercourse.*

Constitutional requirements as to the manner of instituting prosecutions involving the deprivation of life or liberty, can neither be dispensed with by the Legislature, nor waived by the accused.

Though, in the construction of constitutional requirements, the aids of contemporaneous and practical construction must be resorted to with caution and can never be allowed to either abrogate, contradict, enlarge, or restrict the plain and obvious meaning of the text, yet, a uniform practical action affirming the right of the Legislature to exercise an important power, acquiesced in for more than a century, is strong evidence that the power is rightly used.

The phrases, "the law of the land," and "due process of law," as used in our various state constitutions, are synonymous, and mean the law in its regular course of administration through courts of justice.

The declaration in our state Constitution, that no person can "be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers," does not require common law felonies to be prosecuted by indictment, and V. S. 1867, which, as amended, authorizes the prosecution by information of all crimes not capital and not punishable by life imprisonment in state prison, is not in contravention of that provision.

Where, in a prosecution for statutory rape, the prosecutrix testifies for the State, the respondent is not entitled to show by her in cross-examination, as bearing upon her credibility, that, since she was twelve years old down to the time in question, she had had sexual intercourse with many different men.

STATE *v.* STIMPSON was an information for statutory rape. Plea, not guilty. Trial by jury at the March Term, 1905, Orleans County, *Tyler,* J., presiding. Verdict, guilty; judgment and sentence thereon. The respondent excepted.

STATE *v.* LEE was an information for grand larceny. Plea, not guilty. Trial by jury at the December Term, 1904, Lamoille County, *Munson,* J., presiding. Verdict, guilty; judgment thereon. The respondent excepted.

In each case there was a demurrer to the information. Demurrers overruled, *pro forma,* and ordered to lie, to which the respondents excepted.

*J. W. Redmond* for *W. H. Stimpson. Taylor & Dutton* for Edward Lee.

The proceeding by information for felony is in contravention of the declaration in Art. 10 of the Bill of Rights: "Nor can any person be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers." "The law of the land" includes indictment by a grand jury. This has always been the understanding in England, and is what the fathers meant by this expression. 2 Inst. 50, 51;

4 Bl. Com. 306; *Jones* v. *Robbins,* 8 Gray 329; *Com.* v. *Horrigan,* 127 Mass. 450; *Noland's Case,* 122 Mass. 330: *People* v. *Petrea,* 92 N. Y. 128; *Saco* v. *Wentworth,* 37 Me. 172, 58 Am. Dec. 786; Story Const. § 1785; *Prynn's Case,* 5 Mod. 459; Cooley Const. Lim. (7 ed.) 436; 2 Kent 12.

*E. A. Cook,* and *F. G. Bicknell,* State's Attorneys, for the State.

Previous to the abolition of the Court of Star Chamber prosecutions for felony were either by indictment or information. Bac. Abr., Informations; 2 Hawk. P. C. 357.

It is not unconstitutional in this country to prosecute felonies by information. *State* v. *Healey,* 52 Vt. 476; *Rowan* v. *State,* 30 Wis. 145; *State* v. *Boswell,* 104 Ind. 541; *State* v. *Ledford,* 3 Mo. 102.

ROWELL, C. J. The case against Stimpson is an information for statutory rape, and the one against Lee is an information for grand larceny. The principal question in the former, and the only question in the latter, is, whether section 1867 of the Vt. Sts., as amended by No. 46, Acts of 1898, and No. 64, Acts of 1904, is constitutional. It provides that state's attorneys may prosecute by information all crimes except those punishable by death or by imprisonment in the state prison for life. It is claimed that said section is in contravention of the declaration in the Constitution that no person can "be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers." This claim is based upon the contention that the words, "laws of the land," as there used, require prosecutions for common law felonies to be by indictment, because, it is said, those words as used in *Magna Charta,* from which we bor-

rowed them, required that, by settled judicial construction in England, at the time of the adoption of our Constitution, and that it is to be presumed that we took that construction with the words. As bearing on this question, it is important to consider whether that declaration in the Constitution has received a practical construction that has been acquiesced in for a considerable time; for if it has, that will be a valuable aid, to say the least, in determining the intent and meaning of those words as there used.

As early as 1779, state's attorneys were provided for, and authorized to prosecute, manage, and plead in all matters proper, for and in behalf of the State. Slade's State Papers, 331. By an act passed November 10, 1797, it was made the duty of state's attorneys to file informations *ex-officio* in matters proper therefor. Rev. Sts. 1797, c. 64, § 1.

By an act passed February 27, 1787, it was provided that no person should be held to trial nor put to plead for a capital offence punishable with death, unless a bill of indictment was found against him therefor by a grand jury lawfully empanelled and sworn. Sts. of 1787, p. 82. This was only ten years after the adoption of the Constitution, and indicates that thus early the Legislature thought that without such an enactment one might be prosecuted for a capital offence, even, otherwise than by indictment; for it is not to be presumed that the Legislature thought it was passing a useless act. This provision was carried into the Revision of 1797, p. 106, § 65. By an act "for the punishment of certain capital and other high crimes and misdemeanors," passed March 9, 1797, it was provided that no person should be tried for any offence under said act, until a bill of indictment was found against him by the grand jurors attending the Supreme Court of Judicature. Revision of 1797, p. 173,

§ 36. This act did not include larceny, except horse stealing. On March 4, 1797, during the same session, an act was passed "for the punishment of certain inferior crimes and misdemeanors." Revision of 1797, p. 175. This act included larceny of money, goods, chattels, bonds, bills, notes, etc., regardless of value, and divers other offences, but did not provide how any of them should be prosecuted, and larceny is a felony at common law. These two statutes taken together point strongly to the conclusion that at that time it was not supposed that the Constitution required common law felonies to be prosecuted by indictment, but that it was for the Legislature to say what ones should be thus prosecuted, and what ones might be thus or otherwise prosecuted.

The act of March 9, 1797, was reenacted in 1818 with some additions, but not with the addition of larceny, and the act repealed. But the provision in respect of prosecuting by indictment was retained—Acts of 1818, p. 19, § 37—and continued in force till the Revision of 1839, unless it was changed by c. 9, § 1, of the Acts of 1819, constituting state's attorneys "informing officers," which is doubtful, although it is said in *State* v. *Magoon,* 61 Vt. at p. 47, 17 Atl. 729, that prosecution by information of all crimes was authorized by statute from 1819 to 1839.

The act of March 4, 1797, was reenacted in 1821, with an increased penalty for larceny, but was still silent as to the mode of prosecution, and continued so until the Revision of 1839.

Since 1816 it has been the law that when a person is confined in jail on a complaint for a crime or misdemeanor, the Supreme Court may, on his application in writing, direct an information to be filed against him, whereon the Court may receive and record a plea of guilty and award sentence.

V. S. 1895. The act of October 30, 1828, provided that whenever a person was in actual confinement in jail by virtue of a complaint for an offence against said act "for the punishment of certain capital and other high crimes and misdemeanors," the county court should have power and authority, on the application in writing of such person, to direct an information to be filed against him for the offence for which he stood charged, on the filing of which, it was made the duty of the court to proceed in the trial in the same way and manner as if an indictment had been presented by the grand jury. Acts of 1828, No. 3, § 3. And that has been the law ever since—V. S. 1897—and has always been acted upon, except in homicide cases, probably, and without objection as far as we know. This, in effect, is a legislative construction that the Constitution does not require prosecution by indictment in any case, unless we say that the Legislature thought the requirement, if it existed, could be waived by the accused with its consent, which we can hardly do, for the law seems to be otherwise. That mere rights and privileges guaranteed by the Constitution can be waived, to some extent at least, is probably true. But it would seem that constitutional requirements as to the mode and manner of instituting prosecutions involving the deprivation of life or liberty cannot be dispensed with by the Legislature, nor waived by the accused, even with the consent of the Legislature. Cooley Const. Lim., 6th ed., 214 *et seq.,* and 390; *Cancemi* v. *People,* 18 N. Y. 128; *Hopt* v. *Utah,* 110 U. S. 574, 579.

In 1839 it was enacted that no person should be held to answer in any court for an alleged crime or offence, unless upon indictment by a grand jury, except in case of proceedings before a justice, and when a prosecution by information was expressly authorized by statute. Rev. Sts. c. 93, § 1. This

was but the act of March 9, 1797, as reenacted in 1818, with some additions. By c. 102, § 1, of the Revision of 1839, it was provided that state's attorneys might prosecute by information all crimes not capital and where the punishment was by imprisonment in the state prison for a term not exceeding seven years. Both of these statutes are still in force, with an enlargement in the latter of the authority of the state's attorney to prosecute by information all crimes not capital and not punishable in the state prison for life.

It was decided in *State* v. *Leach,* 77 Vt. 166, 59 Atl. 168, that statutory rape can be prosecuted by information. But the constitutionality of that mode of prosecuting was not raised nor considered, and the question has never been decided by this Court, nor raised in it but twice before; once in 1880, in *State* v. *Haley,* 52 Vt. 476, and again in 1888, in *State* v. *Magoon,* above cited; in both of which, strong judicial utterances were made in favor of the correctness of the long practical construction above shown. *State* v. *Haley* was an information for a liquor nuisance, a mere misdemeanor, and the respondent contended that the proceeding should have been by indictment. But the Court held otherwise, and said that the statute had always been supposed to mean that all crimes, except capital and those for which the punishment exceeded seven years in the state prison, might be prosecuted by information, without regard to any distinction between felonies and misdemeanors, and without regard to the punishment prescribed, provided it did not exceed seven years in state prison, and was not capital, and that such had been the construction and uniform practice by all courts, judges, state's attorneys, and lawyers down to that time. *State* v. *Magoon* was an information for grand larceny. The Court said that prosecutions by information for high crimes having been au-

thorized by statute from a time reaching back to a period when many of those who framed and adopted our present Constitution were living, and those statutes having been acted upon unquestioned for nearly seventy years,—it would not be profitable to consider the respondent's contention of unconstitutionality, its consideration being unnecessary. The question was not involved in *State* v. *Dyer,* 67 Vt. 690, 32 Atl. 814. That was an information for conspiracy, held to be a misdemeanor, and the contention was that the case did not come within the statute authorizing the state's attorney to prosecute by information, because the punishment might be by imprisonment in the state prison for more than seven years.

Thus it appears that during substantially the whole time since the adoption of the Constitution, the Legislature has practically construed the clause in question not to require common law felonies to be prosecuted by indictment; and this construction has been acquiesced in and accepted as correct by the courts, and with great unanimity by the profession generally, many of the best of whom have revised the statutes from time to time, commencing with that great lawyer, Nathaniel Chipman, in 1797, who was prominently active in public affairs during the formative period of the Constitution, and must have been imbued with its spirit and meaning.

There is abundant authority for saying that after this long acquiescence in that construction it should not be departed from, but should be accepted as correct beyond the permissibility of question. In *State* v. *Bosworth,* 13 Vt. 402, 413, it is said that questions arising under the Constitution, settled by a long and uniform practice, questioned in the judicial tribunals but once, and then sanctioned, should be considered at rest. Where, the Court asked, is the security

of individual rights, if constitutional questions are to be considered as always open, if no acquiescence, even though sanctioned by judicial decree, is to be regarded as settling them? There the construction had obtained only thirty-four years, while here it has obtained more than a hundred years. See also, *Boyden* v. *Brookline,* 8 Vt. 284.

In *Lincoln* v. *Smith,* 27 Vt. 328, 345, this Court adopted the language of the Supreme Court of the United States in *Briscoe* v. *Bank of the 'Commonwealth of Kentucky,* 11 Pet., at p. 318, that "a uniform action involving the right to the exercise of an important power by the state government for half a century, and this almost without question, is no unsatisfactory evidence that the power is rightly exercised." In *Stuart* v. *Laird,* 1 Cranch, 299, it was objected that the Judges of the Supreme Court had no right to sit as circuit judges, not being appointed nor commissioned as such. But the Court said that practice and acquiescence under it for several years, commencing with the organization of the judicial system, afforded an irresistible answer to the objection, and had fixed the construction of the Constitution, which was too strong to be shaken or controlled.

There are many more cases to the same effect, but they need not be referred to. The subject is pretty fully treated in Cooley's Const. Lim., 7th ed., 102 and following. See, also, Black, Int. Laws, 31; Lewis's Suth. Stat. Const. § 476; Endlich Int. Sts. § 527. But the aids of contemporaneous and practical construction must be resorted to with caution and reserve, and can never be allowed to abrogate, contradict, enlarge, nor restrict the plain and obvious meaning of the text.

As to the true meaning of the words, "law of the land," and "due process of law," as used in the constitutions of our

states, there is a diversity of opinion; but all agree that they mean the same thing, whatever that is, and that if they were combined to read, "due process of the law of the land," the meaning would not be changed.

The Supreme Court of the United States had this question under consideration in 1883, in *Hurtardo* v. *California,* 110 U. S. 516; and pretty much all that can be said on the subject was there brought out in the majority opinion by Mr. Justice MATTHEWS, and in the dissenting opinion of Mr. Justice HARLAN.

The Constitution of California, adopted in 1879, provides that offences theretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, as may be prescribed by law; and that a grand jury shall be summoned at least once a year in each county. By the Penal Code of the State, when a defendant has been examined and committed as thereby provided, it is the duty of the district attorney to inform against him for the offence. The plaintiff in error having been thus examined and committed for murder, the district attorney informed against him for that crime, and he was convicted and sentenced to death, and the question was whether that was "due process of law" within the meaning of the Fourteenth Amendment of the Federal Constituition, which forbids the states to "deprive any person of life, liberty, or property without due process of law," and it was held that it was; that an indictment or a presentment by a grand jury as known to the common law of England, is not essential to that "due process of law," when applied to prosecutions for felonies, that is guaranteed by the Federal Constitution, and forbidden to the states to dispense with in the

administration of criminal law; that those words refer to the law of the land in each state that derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice that lie at the foundation of all our civil and political institutions, the greatest security for which lies in the right of the people to make their own laws, and to alter them at pleasure. The Court said that in this country, written constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power delegated to their governments, and so the provisions of *Magna Charta* were incorporated into Bills of Rights; that they were limitations upon all the powers of government, legislative as well as executive and judicial; that it necessarily happened, therefore, that as these broad and general maxims of liberty and justice held in our system a different place and performed a different function from their position and office in English constitutional history and law, they would justify and receive a corresponding and more comprehensive interpretation; that they applied in England only as guards against executive usurpation and tyranny, while here they have become bulwarks also against arbitrary legislation; but, in that application, as it would be incongruous to measure and restrict them by the ancient customary law of England, they must be held to guarantee, not particular forms of procedure, but the very substance of individual rights to life, liberty, and property. The Court approved and commended as most accurate the language of Mr. Justice JOHNSON in *Bank of Columbia* v. *Okeley*, 4 Wheat. 235, 244, when he said, speaking of those words from *Magna Charta*, incorporated into the Constitution of Maryland, that "after volumes spoken and written with a view to their exposition, the good sense of mankind

has at last settled down to this,—that they were intended to
secure the individual from the ·arbitrary exercise of the
powers of government, unrestrained by the established princi-
ples of private rights and distributive justice." Such is the
oft-repeated and settled doctrine of that Court. And this
Court approved that doctrine in *State* v. *Hodgson,* 66 Vt. 134;
157, 28 Atl. 1089, which was affirmed by the Supreme Court
of the United States in *Hodgson* v. *Vermont,* 168 U. S. 262.
And such has been and is, the prevailing opinion in this
country, both judicial and individual. Chancellor KENT says
that "the better and larger definition of 'due process of law'
is, that it means law in its regular course of administration
through courts of justice." 2 Com. *13. Webster's famous
definition in the Dartmouth College case is often quoted. "By
the law of the land," he says, "is most clearly intended the
general law; a law that hears before it condemns; that pro-
ceeds upon inquiry, and renders judgment only after trial.
The meaning is that every citizen shall hold his life, liberty,
property, and immunities under the protection of the general
rules that govern society," etc. Judge COOLEY says this defini-
tion is apt and suitable to judicial proceedings. He says that
he has met in no judicial decision a statement that embodies
more tersely and accurately the correct view of the matter·
than the language of Mr. Justice JOHNSON above quoted. He
then goes on to say, that "the principles, then, on which the
process is based, are to determine whether it is 'due process
of law' or not, and not any considerations of mere form,"
which, he says, may change from time to time, with due re-
gard to the landmarks established for the protection of the
citizen. Const. Lim. *355. Again he says, "Due process of
law in each particular case means, such an exertion of the
powers of government as the settled maxims of law permit

and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." Ib. *356.

The Supreme Court of Tennessee says, that "when first adopted in *Magna Charta,* the phrase, 'law of the land,' had reference to the common and statute law then existing in England; and when embodied in our Constitution, it referred to the same common law as previously modified, and as far as suited to the wants and conditions of our people in a new country. At present, the 'law of the land' embraces the same body of laws as still further modified; those parts validly cut off being now excluded, and those parts validly added being now included. Every valid statute of the State now in existence, whenever enacted, is the present 'law of the land' in respect to the subject-matter of that statute, and every existing enactment passed with due form and ceremony and not in conflict with some provision of the State or Federal Constitution, is a valid statute; and no statute otherwise valid is unconstitutional because affecting life, liberty, or property, if, when being general, it embraces all persons who are or may be in like situation and circumstances, or, when being special, it is, in addition, natural and reasonable in its classification." *Harbison* v. *Knoxville Iron Co.,* 103 Tenn. 421, 437, 76 Am. St. Rep. 682, affirmed in 183 U. S. 13.

The Supreme Court of Mississippi says in *Brown* v. *Levee Commissioners,* 50 Miss. 468, speaking of the words, "due process of law," that "the principle does not demand that the laws existing at any point of time shall be irrepealable, nor that any forms of remedies shall necessarily continue. It refers to certain 'fundamental rights which that system of jurisprudence, of which ours is a part, has always recognized. If any of these are disregarded in the proceedings by which a

person is condemned to the loss of life, liberty, or property, the deprivation has not been by 'due process of law.' "

The Constitution of Wisconsin originally declared that "no person shall be held to answer for a criminal offence, unless on presentment or indictment of a grand jury." That clause was amended in 1870 so as to read, "no person shall be held to answer for a criminal offence without due process of law." The statute of 1871 provided that the several courts of the State should possess, and might exercise, the same power and jurisdiction to try prosecutions on information for all crimes, as they possessed and might exercise in cases of like prosecution on indictment. *Rowan* v. *State,* 30 Wis. 129, was an information for murder, and the question was whether the amendment changed the meaning of the Constitution, or, in other words, whether "due process of law," and, "on presentment or indictment of a grand jury," meant the same thing, and it was held that they did not. The Court said that the words, "due process of law," did not mean, and had not the effect, to limit the powers of the State to prosecution of crime by indictment, but meant law in its regular course of administration according to prescribed forms and in accordance with the general rules for the prosecution of individual rights.

The Supreme Court of Texas says that when the words, "law of the land," were used in *Magna Charta,* they probably meant the established law of the kingdom in opposition to the Roman law, which was about being introduced into the land, but that now, in their most usual acceptation, they are regarded as meaning general public laws, binding all the members of the community in similar circumstances, and not partial or private laws, affecting the rights of private individuals. *Janes* v. *Reynolds,* 2 Tex. 250.

The Supreme Court of California, in the judgment under review in the *Hurtardo* case, followed its previous decision in *Kalloch* v. *Superior Court,* 56 Cal. 229, in which it held that the proceeding, as regulated by the Constitution and laws of the State, was not opposed to any of the definitions of "due process of law" and "the law of the land," but was strictly within such definitions, as much as was a proceeding by indictment, and took from the accused no immunity nor protection to which he was entitled under the law.

In Utah, the words, "due process of law," are held to mean, law in the regular course of administration through the courts. *In re McKee,* 19 Utah 231, 242. Indiana holds the same. *State* v. *Boswell,* 104 Ind. 541.

It is said in *Hoke* v. *Henderson,* 4 Dev. Law, 15 N. C. 1, 25 Am. Dec. pp. 688, 689, that the words, "law of the land," do not mean merely an act of the General Assembly; for if they did, every restriction upon legislative authority would be at once abrogated. But that they mean that such legislative acts as profess in themselves directly to punish persons, or to deprive the citizen of his property without trial before the judicial tribunals, and a decision upon the matter of right as determined by the laws under which it vested, according to the course, mode, and usages of the common law,— are not effectually laws of the land for those purposes.

Many of the other states adopt the view of the cases referred to, but some of them hold the other way, notably Massachusetts in *Jones* v. *Robbins,* 8 Gray 329.

Mr. Stephen says in the first volume of his History of the Criminal Law of England, p. 595, that "from the earliest times, the King accused persons of offences not capital in his own court by the agency of his legal representatives without the intervention of a grand jury."

But it is objected that *Hurtardo* v. *California* is not in point here, because, the case coming within the Penal Code of that State, its Constitution expressly authorized prosecution by information, whereas our Constitution gives no such authority. But the objection is not well taken, for if an information for a capital offence was forbidden by the Fourteenth Amendment, the Constitution of the State could not authorize it in any circumstances. So the case is precisely in point.

Thus it appears that the practical construction that our Constitution has so long received in this respect accords with the prevailing opinion in this country, which we think the better opinion, and therefore we the more readily hold that our Constitution does not require common law felonies to be prosecuted by indictment, and that consequently the statute in question is constitutional.

In the rape case, it appeared that the girl consented in fact, but she could not consent in law, as she was under the age of consent. As bearing on her credibility as a witness, and as tending to show a motive to charge the respondent with the crime, the respondent offered to show by her on cross-examination that she was six or eight months gone with child, and was never pregnant before; and that ever since she was twelve years old, down to the time in question, she had had sexual intercourse with many different men. The State offered to admit her pregnancy, but objected to her being cross-examined as to her intercourse with other men. But the respondent did not want the admission of pregnancy unless he could cross-examine as to the intercourse, which was not permitted.

As a general rule, particular acts of misconduct are not provable by extrinsic evidence. In this State, you cannot

prove by such evidence that a woman is a prostitute, for the purpose of impeaching her credibility as a witness. *Morse* v. *Pineo,* 4 Vt. 281; *State* v. *Smith,* 7 Vt. 141; *Spears* v. *Forrest,* 15 Vt. 435. Nor that a witness is a notorious counterfeiter. *Crane* v. *Thayer,* 18 Vt. 162. Nor the keeper of a house of ill-fame. *State* v. *Fournier,* 68 Vt. 262, 270.

*State* v. *Hollenbeck,* 67 Vt. 34, 30 Atl. 696, relied upon by the respondent as expressly deciding this question, is not in point. That was an indictment for rape *simpliciter,* and the woman was of the age of consent, as shown by the record in that case, and as is inferable from the case as reported. In such a case, there is no doubt but the respondent has a legal right to cross-examine the complainant as to her intercourse with other men; not to shake her credit as a witness, but to show her consent, and so no rape. What is said in that case about allowing the cross-examination to be as unrestricted and searching as consistent with the rules of law, related to the refusal of the trial court to accord to the respondent his legal right to show by the complainant that her relations with him were friendly and cordial at the time of the alleged offence, and continued so afterwards. Whether in the case at bar the court could have allowed the cross-examination as matter of discretion, is a question not before us.

As to a motive to charge the respondent unjustly, the case as presented would afford no ground for such an inference had the claimed intercourse with other men been shown.

Judgment in Stimpson's case that *there is no error in the proceedings of the county court, and that the respondent take nothing by his exceptions;* and judgment in Lee's case that *there is no error, and that sentence be imposed and execution thereof done.*